Felice B. Galant
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019-6022
Tel.: (212) 318-3000
Fax: (212) 318-3400
Email: felice.galant@nortonrosefulbright.com

Matthew H. Kirtland (*pro hac vice forthcoming*)
Esha Kamboj
NORTON ROSE FULBRIGHT US LLP
799 9th Street NW, Suite 1000
Washington, DC 20001
Tel.: (202) 662-0200
Fax: (202) 662-4643
Email: matthew.kirtland@nortonrosefulbright.com
       esha.kamboj@nortonrosefulbright.com

*Attorneys for Petitioner Republic of Kazakhstan*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE APPLICATION OF REPUBLIC OF KAZAKHSTAN FOR ORDER DIRECTING DISCOVERY FROM THE CLEARING HOUSE PAYMENTS COMPANY L.L.C. PURSUANT TO 28 U.S.C. § 1782 | Misc. Action No. _____ |

### *EX PARTE* PETITION FOR DISCOVERY IN AID OF FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782

Pursuant to 28 U.S.C. § 1782, the Republic of Kazakhstan ("**Petitioner**" or the "**Republic**") respectfully submits this petition ("**Petition**") for an order permitting it to issue subpoena(s) to The Clearing House Payments Company L.L.C. ("**TCH**") that will assist Petitioner in obtaining evidence for use in ongoing and anticipated foreign legal proceedings.

Attached hereto are a proposed Order, a proposed form of a subpoena *duces tecum* (**Exhibit A**), and the supporting Declaration of Matthew H. Kirtland ("**Kirtland Decl.**") (**Exhibit B**).[1]

## REASONS FOR GRANTING THE PETITION

**I.    PETITIONER'S PURPOSE FOR SEEKING § 1782 DISCOVERY**

1.      Petitioner requires discovery from TCH in connection with (1) ongoing criminal proceedings against Moldovan oligarch Anatolie Stati, his son Gabriel Stati, and their companies Ascom Group S.A. ("**Ascom**") and Terra Raf Trans Traiding Ltd. ("**Terra Raf**") (collectively the "**Statis**") in Luxembourg; (2) ongoing civil proceedings in the Netherlands between the Statis and Petitioner; and (3) ongoing and anticipated proceedings against the Statis in the courts of Belgium and other jurisdictions concerning costs and damages owed by the Statis to the Republic (collectively, the "**Foreign Legal Proceedings**").  Kirtland Decl. ¶ 5.

2.      A common issue in each of the Foreign Legal Proceedings is a series of complex, multi-faceted fraud schemes, including money laundering schemes, engineered by the Statis. Petitioner has obtained substantial evidence regarding certain elements of the Statis' fraud schemes to date.  *Id.* ¶ 6.  The Statis' fraud has not yet been fully unraveled and, as importantly, the Statis are continuing to dispute their fraud and the specific schemes discovered to date in various proceedings.  The discovery requested in this Petition is relevant to the Statis' fraud schemes.  *Id.* ¶ 7.  The discovery is also relevant to locate the Statis' assets to execute on cost orders issued against the Statis, as well as potential judgments against the Statis, in ongoing and anticipated civil proceedings.  *Id.*

**II.   THE FOREIGN LEGAL PROCEEDINGS**

   **A.    THE BELGIUM PROCEEDINGS**

---

[1] Upon service of the proposed subpoena, TCH will be able to assert objections that may be available to it under Federal Rule of Civil Procedure 45, and thus its rights will be fully protected.

3. In 2010, the Statis initiated arbitration proceedings against the Republic under the Energy Charter Treaty (the "**ECT Arbitration**") and obtained an arbitral award against the Republic in 2013 in an amount in excess of $500 million (the "**ECT Award**"). *Id.* ¶ 8. The Statis thereafter commenced proceedings in several jurisdictions to enforce the ECT Award. The Republic is resisting enforcement of the ECT Award on the grounds that it was obtained by fraud. *Id.*

4. One of the jurisdictions in which the Statis attempted to enforce the ECT Award was Belgium. *Id.* ¶ 9. Before the Republic had obtained all of the presently-available evidence of the Statis' fraud schemes, which it uncovered piece-meal years after the arbitration concluded, the Statis managed to obtain recognition of the ECT Award in Belgium. *Id.* Subsequently, the Republic was able to present its existing fraud case (*i.e.*, based on evidence uncovered by that time), and on November 16, 2021, the Brussels Court of Appeal in Belgium ("**Belgium Court of Appeal**") held that (i) the Statis had in fact engaged in the fraud schemes alleged by the Republic, and (ii) these fraud schemes existed before, during, and after the ECT Arbitration.[2] As a result, the Belgium Court of Appeal held that the ECT Award could not be recognized or enforced in Belgium because doing so would violate the Belgian public policy against fraud. Kirtland Decl., Ex. 1.

5. With respect to the Statis' fraud committed <u>before</u> the ECT Arbitration, the Belgium Court of Appeal found *inter alia* that:

> 1. the Statis falsely recorded related-party transactions in their financial statements as being at arms-length with independent third parties, *id.* at 20;

---

[2] A true and correct copy of the Belgium Court of Appeal decision is attached at Exhibit 1 to the Kirtland Decl., in its original French and a verified English translation.

2. "[t]he Statis had purposefully misled their auditor [KPMG] in order to give credibility to their financial statements in the eyes of third parties," *id.* at 27;

3. the Statis have since "admitted to concealing (Stati-owned company) Perkwood from their financial statements, in clear violation of IFRS [International Financial Reporting Standards], with the view in particular to avoid a review of the transactions between Perkwood and TNG by an independent third party" in order to "deliberately conceal[] the true status of Perkwood," *id.* at 20, 27, and 29; and

4. the "Statis' investment in Kazakhstan was conducted in bad faith." *Id.* at 29.

6. With respect to the Statis' fraud committed <u>during</u> the ECT Arbitration, the Belgium Court of Appeal found *inter alia* that:

1. the Statis legitimized their fraudulent financial statements by relying on audit reports which were later withdrawn in August 2019 by KPMG so that "no reliance should be placed on [them]," *id.* at 24;

2. the Statis obtained damages on the basis of an indicative offer that they knew was based on their fraudulent financial statements and fraudulently obtained audit reports, *id.* at 27–28;

3. the Statis failed to disclose the true status of Perkwood, a company that the Statis secretly owned but falsely represented as an independent third party supplier, and this failure to disclose was the result of a purposeful scheme by the Statis to manipulate and inflate their construction costs, *id.* at 20, 29;

      4.      the Statis relied on documents that Mr. Lungu, the Statis' former CFO, confirmed in his April 2019 deposition were materially false, *id.* at 21–22;

      5.      the false evidence "had an influence on the [award] both at the stage of assessing the causal link between [the Republic's] liability and the damage and at the stage of assessing the quantum of the damage claimed by the Statis," *id.* at 22;

      6.      the Statis insisted on the supposed "reliability" of their financial statements to demonstrate the legality of their investment in Kazakhstan, and that they had been audited by a "Big Four" auditing firm [KPMG], without disclosing that the auditors had been deceived, *id.* at 23; and

      7.      "due to the Statis maneuvres and withholding of information, the arbitrators were misled. They were prevented from taking cognizance of the real financial situation of the Statis, which was essential to be able to adjudicate the matter." *Id.* at 29.

7. On this basis, the Belgium Court of Appeal held that the tribunal in the ECT Arbitration "relied on evidence that is now known to be inaccurate and tainted by misstatements" and that all the evidence gathered by the Republic since the ECT Award was issued demonstrates "beyond any possible doubt the fraudulent behavior of the Statis." *Id.* at 22, 24.

8. With respect to the Statis' fraud committed <u>after</u> the ECT Arbitration, the Belgium Court of Appeal held *inter alia* that the Statis defrauded the Swedish courts during the proceedings initiated by the Republic in 2014 to set-aside/annul the ECT Award.  Specifically, the court held that the Statis "knowingly concealed… the truth" and "deliberately misled the Swedish courts…which – purposefully – prevented these jurisdictions from ruling on the matter on the basis of all the information and evidence available." *Id.* at 7–8.  This component of the

Statis' fraudulent schemes was egregious because the Statis then deployed these fraudulently-obtained Swedish court decisions in multiple courts around the world, including in the United States, to erroneously assert that the Republic's fraud claims had no basis. *Id.*

9. The Statis appealed the Belgium Court of Appeal's decision in March 2022, but therein have not challenged any of the Belgium Court of Appeal's factual findings of fraud. Kirtland Decl. ¶ 17.

10. One consequence of the November 2021 Belgium Court of Appeal decision was that attachments obtained by the Statis in Belgium in consequence of their fraudulent ECT Award were deemed null and void. *Id.* ¶ 18.

11. Petitioner and the National Bank of Kazakhstan have now initiated proceedings against the Statis for damages caused by these improper attachments (the "**Belgium Damages Proceedings**"). In June 2022, the Brussels Court of First Instance allowed these claims to proceed, and the Republic is permitted to file submissions and supporting evidence in these proceedings. *Id.* ¶ 19.

12. The discovery requested in this Petition will be of potential use to the Republic in these Belgium proceedings, either in the phase in which they presently sit or in subsequent phases that are within reasonable contemplation, such as further appeals or remanded proceedings. *Id.* ¶ 20. Specifically, the discovery requested from TCH will shed further light on the Statis' money laundering schemes and will assist Petitioner in efforts to execute on any judgment issued against the Statis in the Belgium Damages Proceedings. *Id.*

    **B.    THE LUXEMBOURG CRIMINAL PROCEEDINGS**

13. Another jurisdiction in which the Statis attempted to enforce the fraudulent ECT Award was Luxembourg. *Id.* ¶ 21.

14. In May 2019, after discovering further evidence of the Statis' schemes, the Republic filed a Criminal Complaint before the Investigating Judge of the Luxembourg District Court (the "**Investigating Judge**") based on the evidence of the fraud that had been collected at that time. *Id.* ¶ 22.

15. The Criminal Complaint asserted that the Statis, by attempting to enforce the fraudulent ECT Award in Luxembourg:

    1. engaged in forgery, attempted forgery, and attempted use of forgery in violation of Sections 196 and 197 of the Luxembourg Criminal Code;

    2. obtained or attempted to obtain a judgment by fraud in violation of Section 496 of the Luxembourg Criminal Code; and

    3. engaged in money laundering or attempted money laundering in violation of Section 506 of the Luxembourg Criminal Code. *Id.* ¶ 23.

16. On February 2, 2021, the Republic updated its Criminal Complaint by submitting newly discovered evidence of the Statis' unlawful conduct. *Id.* ¶ 24.

17. On September 26 and 27, 2022, the Investigating Judge interrogated Anatolie Stati concerning a number of topics arising from the Criminal Complaint. *Id.* ¶ 25. Mr. Stati attended the interrogation by videoconference from a courtroom in Moldova and was represented by attorneys present both in the courtroom in Luxembourg and in the courtroom in Moldova. *Id.* Attorneys for the Republic were present at the interrogation and they, alongside attorneys for Mr. Stati, were also allowed to ask questions. *Id.*

18. On September 27, 2022, at the conclusion of the interrogation, the Investigating Judge officially indicted Anatolie Stati on all of the charges put forward in the Criminal Complaint, *i.e.*:

1. forgery and use of forgery, or attempted forgery and use of forgery, committed in violation of Sections 196 and 197 of the Luxembourg Criminal Code;

2. defrauding or attempting to defraud a court within the meaning of Section 496 of the Luxembourg Criminal Code; and

3. money laundering or attempted money laundering within the meaning of Section 506-1 of the Luxembourg Criminal Code. *Id.* ¶ 26.

19. On November 14, 2022, the Investigating Judge interrogated Gabriel Stati in the criminal proceedings. At the conclusion of the interrogation, the Investigating Judge officially indicted Gabriel Stati on the same aforementioned charges put forward in the Criminal Complaint. *Id.* ¶ 27.

20. Under the Luxembourg Criminal Code, an indictment (*l'inculpation*) means that an investigating judge (*juge d'instruction*) considers there to be sufficient evidence to establish guilt (*indices suffisants de culpabilité*). *Id.* ¶ 28. An indictment is made on the basis of the evidence obtained through interrogations, searches, or other sources provided to the investigating judge. *Id.* An indictment is not a judgment. Depending on the facts that come to the attention of the investigating judge during the course of the investigation, an indictment may be amended or not confirmed. *Id.* ¶ 29.

21. Following the indictments of Anatolie Stati and Gabriel Stati, the Investigating Judge will continue the investigation. Once the Investigating Judge considers the investigation to be complete, the judge will issue a closure order (*ordonnance de clôture*), which is not subject to appeal, and send the file to the Public Prosecutor's Office for further proceedings, including a trial if serious and corroborating evidence of guilt (*indices graves et concordants de culpabilité*) is determined. *Id.* ¶ 30.

22.    The Republic is entitled to submit further evidence regarding the Statis' unlawful conduct, including their fraud schemes, to the Luxembourg authorities in connection with the criminal proceedings.  *Id.* ¶ 31.  Accordingly, the discovery requested from TCH will be of use in these ongoing criminal proceedings against the Statis, either in the phase in which they presently sit or in subsequent phases that are within reasonable contemplation, such as appeals or further remanded proceedings.  *Id.*

        C.        **THE NETHERLANDS EXEQUATUR PROCEEDINGS**

23.    Another jurisdiction in which the Statis initiated *ex parte* proceedings to recognize their fraudulent ECT Award was the Netherlands.  *Id.* ¶ 32.  In December 2021, the Dutch Supreme Court issued an order reversing the July 2020 decision of the Amsterdam Court of Appeal that had upheld exequatur (*i.e.*, recognition) of the award.  *Id.*  The case was then remanded to the Amsterdam District Court, where the Statis have initiated new proceedings to attempt to have their fraudulent ECT Award recognized.

24.    The Statis' fraud is directly at issue in these proceedings because the Republic has asserted that the fraud renders the ECT Award unenforceable under the law and public policy of the Netherlands.  *Id.* ¶ 33.  Most recently, the Amsterdam District Court held a hearing in these proceedings on November 21, 2022.  *Id.*

25.    The discovery requested in this Petition will be of use to the Republic in these proceedings, and will be of potential use in other proceedings in the Netherlands,[3] either in the phase in which they presently sit or in subsequent phases that are within reasonable contemplation, such as further appeals or remanded proceedings.  *Id.* ¶ 34.

---

[3] The Statis also initiated proceedings in the Netherlands to attach shares in KMG Kashagan B.V. – a state-owned company – held by Samruk-Kazyna JSC ("**Samruk**").  On June 14, 2022, the Court of Appeal of the Hague lifted the Statis' attachment with immediate effect.  The Statis appealed the decision on August 8, 2022, and those proceedings are ongoing.  *Id.* ¶ 34 n. 2.

### D. THE ENGLISH COST PROCEEDINGS

26. On May 4, 2020, the English High Court ordered the Statis to pay the Republic and the National Bank of Kazakhstan (a) costs in the amount of £1.5 million in connection with attachment proceedings brought by the Statis (the "**Legal Cost Order**") in that jurisdiction; and (b) additional costs that had been paid by the Republic and the National Bank of Kazakhstan in relation to the attachment proceedings (the "**Indemnity Cost Order**") (collectively, the "**English Cost Orders**"). *Id.* ¶ 35.

27. The Republic and the National Bank of Kazakhstan thereafter itemized their cost claims and commenced proceedings to confirm the amounts owed by the Statis. *Id.* ¶ 36. After the Statis failed to respond, the English High Court issued a default cost certificate for the Legal Cost Order in the amount of $3,730,290.00. *Id.* On January 15, 2021, the Statis filed an application to set aside the default cost certificate, which was denied by judgment and order dated March 11, 2021. *Id.*

28. On June 17, 2022, the English High Court issued another default cost certificate for the Indemnity Cost Order in the amount of £2,292,134.63. *Id.* ¶ 37.

29. The English Cost Orders arose in the context of the Statis' wrongful attachment of cash or securities held by the London branch of the Bank of New York Mellon ("**BNYM**"). *Id.* ¶ 38.

30. The Statis have not made any cost payments and are therefore in breach of the English Cost Orders totalling circa £5.8 million. In light of the Statis' attempts to hide their assets through their money laundering schemes as set forth in further detail herein, the discovery requested in this Petition will be of use to the Republic in reasonably anticipated proceedings to collect on the English Cost Orders. *Id.* ¶ 39.

III.     INFORMATION REQUESTED FROM TCH

    A.     INFORMATION IN THE POSSESSION OF TCH

31.     TCH is a banking association that is jointly owned by the largest commercial banks in the U.S. and operates the Clearing House Interbank Payments System ("**CHIPS**").  As a fund-transfer system, CHIPS processes and settles "payment messages," which are an instruction from a sending bank to a receiving bank to pay – or cause another bank to pay – a specified amount of money to a beneficiary in U.S. dollars.[4]  *Id.* ¶ 40.

32.     As the operator of CHIPS, TCH retains records of CHIPS payment messages concerning transactions conducted in U.S. dollars.  *Id.* ¶ 41.

33.     Petitioner seeks an Excel spreadsheet of the U.S. dollar transactions during the last seven years – the amount of time for which TCH retains records – between or among the following persons, all of which are members of the Stati family, companies that are owned or operated by the Statis, or individuals who have a senior role in such Stati companies:

    1.     Anatolie Stati

    2.     Gabriel Stati

    3.     Larisa Stati

    4.     Nicoleta Stati

    5.     Eduard Calancea

    6.     Eldar Kasumov

    7.     Elena Ozerov

    8.     Gheorghe Ciobanu

    9.     Ascom Group S.A.

    10.    Ascom Group Ltd

---

[4] *See* https://www.theclearinghouse.org/about/subpoena-instructions.

11. Ascom-Grup SA
12. Ascom Oil Company Ltd
13. Ascom Sudd Operating Company Ltd
14. Azalija OOO
15. Cardhall Services Ltd
16. Casco Petroleum Middle East Ltd
17. Casco Petroleum Overseas Ltd
18. East-West International SA
19. Garantie SA
20. Gast Geophysical Ltd
21. General Affinity Ltd
22. Getter Investment Ltd
23. Gheso SA
24. GI-Marketing SRL
25. Hayden Intervest Ltd
26. Jepson Corporation Ltd
27. Komet Group S.A.
28. Laren Advisory Ltd
29. Laren Holdings Ltd
30. Lenwell Solutions Inc
31. Melvin Production Inc
32. Moliwood SA
33. Montvale Invest Ltd
34. Newtech Solutions Ltd

35. Novitas SA

36. Pellat International Ltd

37. Perkwood Investment Ltd

38. Portlend Oil Processing Inc

39. Pulmer Management Ltd

40. RW-DC Energy Investments SA

41. Stadoil Ltd

42. Stal-Petrol SRL

43. Stati & Company SRL

44. Stati & Co SRL

45. Stati Oil SRL

46. TD Dedal Instrument OOO

47. Terra Raf Trans Traiding Ltd

48. Tristan Energy LLP

49. Tristan Energy Capital Ltd

50. Tristan Energy Solutions

51. Tristan Gas Energy Ltd

52. Tristan Gas & Oil Ltd

53. Tristan Oil Ltd

54. Tristan Oil & Gas Ltd

55. Tristan Real Estate Ltd

56. Tristan World Gas & Oil Ltd

57. Vila Demetra SRL

B. **RELEVANCE OF THE INFORMATION REQUESTED**

34. In August 2019, the Republic discovered – through assistance from the Republic of Latvia – bank records for the Statis' accounts at Rietumu Banka in Latvia which reveal extensive money laundering schemes by the Statis in connection with their misappropriation of their investors' monies. *Id.* ¶ 43. Specifically, these records show that the Statis used a network of nominee companies to launder funds from their multiple fraud schemes into their own bank accounts in offshore jurisdictions and used the misappropriated funds to make a large number of payments for their own personal benefit. *Id.* The documents also include evidence of ownership, powers of attorney, and certificates identifying the beneficiaries of the accounts held by Rietumu Banka showing that the Statis have, or have had, interests in numerous shell companies, some of which still exist and may continue to hold assets. *Id.* ¶ 44.

35. PricewaterhouseCoopers LLP ("**PwC**") performed an analysis of the Rietumu bank statements, which confirmed that the Statis systematically stripped their Kazakh companies of hundreds of millions of dollars using a web of companies to conceal the flow, and ultimate location of, the funds.[5] In July 2020, PwC issued two expert opinions and identified "a number of transactions by the [Statis] which display characteristics that are relevant to the risk set out under the red flags of money laundering" and "effective 'ring' of related parties (some of which the [Statis] failed to identify as related parties to professional advisors such as their auditors, KPMG) established by the [Statis] around TNG and KPM."[6] Based on the bank statements and related documents, PwC concluded that millions of dollars of investors' monies owed to the

---

[5] PwC, Review of Transactions by the Stati Parties for Characteristics of Money Laundering Risks, July 29, 2020, Appendix 4.1. A true and correct copy is attached hereto at Exhibit 2 to the Kirtland Decl.

[6] *Id.,* ¶ 3.73.

Statis' Kazakh companies were instead diverted and retained by related Stati companies for their personal benefit.  Kirtland Decl., Ex. 2, ¶ 3.40.[7]

36.     Two experts who specialize in the field of international money laundering have prepared opinions that assess the existing evidence of the Statis' fraud schemes.  <u>First</u>, in July 2020, Stefan D. Cassella, the former Deputy Chief of the U.S. Department of Justice's Asset Forfeiture and Money Laundering Section, issued an opinion in which he assessed the then-existing evidence of the Statis' fraud in the context of potential violations of money laundering laws of the United States and other jurisdictions and opined *inter alia* that: the Statis' "transactions involving . . . fraudulently obtained funds constitute criminal violations of Latvian money laundering laws" and that "because one part of the [Statis'] scheme involved investors in the United States whose funds were transferred overseas, . . . the transactions constituted criminal violations of US money laundering laws as well."  A true and correct copy of Mr. Cassella's opinion is attached hereto at Exhibit 3 to the Kirtland Decl.

37.     Mr. Cassella further opined that the "ECT Award would constitute the proceeds of crime (i.e. fraud), and any attempt by the [Statis] to collect on the Award could constitute a money laundering offense under US law or the law of any other country where the collection

---

[7] For example, the bank statements reflect that the Statis diverted millions of dollars of monies received from their investors to their company in South Sudan, Ascom Sudd Operating Limited, which was subsequently placed on the U.S. Department of Commerce's list of companies "reasonably believed to be involved, or to pose a significant risk of being or becoming involved, in activities contrary to the national security or foreign policy interests of the United States." Kirtland Decl. ¶ 46 n. 6.  According to the U.S. Government, the companies on this list contribute to the crisis in South Sudan because they supply the country with significant "revenue that, through public corruption, is used to fund the purchase of weapons and other material that undermine the peace, security, and stability of South Sudan rather than support the welfare of the South Sudanese people." *Addition of Certain Persons to the Entity List and Removal of Certain Persons From the Entity List; Correction of License Requirements*, 83 Fed Reg. 12,475–12,476 (Mar. 22, 2018); 15 South Sudanese Entities Added to the Entity List (Mar. 22, 2018), U.S. DEPARTMENT OF COMMERCE, https://www.bis.doc.gov/index.php/regulations/export-administration-regulations-ear/17-regulations.

occurred." Kirtland Decl., Ex. 3 at 20–21.  On this basis, Mr. Cassella concluded that there is evidence that the Statis "could be prosecuted criminally in Latvia for money laundering offenses involving the proceeds of the [fraud] scheme[s], and in the United States and in other jurisdictions for conducting any future financial transaction involving the Award from the Tribunal in the ECT Arbitration." *Id.*

38. Second, in June 2022, Mark Pieth, the former Head of Section on Economic and Organised Crime in the Swiss Federal Office of Justice and Professor of Criminal Law and Criminology at the University of Basel, Switzerland, issued an opinion in which he assessed the then-existing evidence of the Statis' fraud in the context of money laundering laws of Sweden, Belgium, Luxembourg, and the United Kingdom.  A true and correct copy of Mr. Pieth's opinion is attached hereto at Exhibit 4 to the Kirtland Decl.

39. Professor Pieth concluded that "the Statis have continued with their fraudulent scheme into the arbitration and post-arbitration phase," and that "[s]uccessfully collecting on the [ECT Award], and any further use, transfer, concealment etc. of the assets would constitute money laundering." Kirtland Decl., Ex. 4, ¶¶ 82, 109.  He further concluded that according to an "analysis of relevant national laws, concrete activities to enforce a fraudulently obtained award would constitute at least an attempt to money laundering…[and] [a]s far as the Statis are repeating the manipulative statements and re-using the misleading documents, they are committing a new fraud on the court, letting prescription start all over." *Id.*, ¶ 161.

40. All of the known accounts held by the Statis and their companies at Rietumu Banka were closed by 2018.  Kirtland Decl. ¶ 51.  In part as a result of the Statis' money laundering schemes, the amounts previously held in the Rietumu bank accounts for the Stati companies were very substantial before the accounts were closed.  For example:

1. between December 22, 2005 and April 17, 2018, the account of Tristan Oil Ltd recorded a turnover of funds in excess of $2.5 billion;

2. between August 9, 2007 and April 17, 2018, the account of Komet Group S.A. recorded a turnover of funds in excess of $507 million;

3. between November 12, 2007 and April 17, 2018, the account of Ascom Oil Company Ltd recorded a turnover of circa $95 million;

4. between November 11, 2005 and January 9, 2018, the account of Hayden Intervest Ltd recorded a turnover of funds in excess of $2.3 billion.

41. Upon information and belief, when the Rietumu Banka accounts were closed, the Statis transferred the funds from these accounts to related individuals, to the Statis' other related companies, or to bank accounts held by some of the Statis' existing companies in other jurisdictions. For example, the Rietumu bank statements show that between October 2013 and August 2015, Komet Group S.A. transferred over $10 million from its Rietumu bank account to its account at Turkiye Vakiflar Bank. *Id.* ¶ 52.

### IV. THE REQUIREMENTS OF § 1782 ARE SATISFIED

42. To authorize discovery under 28 U.S.C. § 1782, three requirements must be met: (1) the application must be made by an interested party or upon application of a foreign or international tribunal; (2) the party from whom discovery is sought must "reside" or be "found" in the jurisdiction of the district court where the § 1782 petition has been filed; and (3) the document or testimony must be "for use" in a foreign or international tribunal. *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 246 (2004).

43. "The 'proceeding' for which discovery is sought under § 1782(a) must be within reasonable contemplation, but need not be 'pending' or 'imminent.'" *Id.* at 247. With respect to criminal proceedings, Section 1782 is available while such proceedings are pending as well as

"before formal accusation," which language was added in a 1996 amendment and has been interpreted by the Supreme Court to confirm the broad range of discovery permitted by Section 1782. *Intel*, 542 U.S. at 258–59 (citations omitted) ("Nothing suggests that this amendment was an endeavor to rein in, rather than to confirm, by way of example, the broad range of discovery authorized in [the previous version of Section 1782]."); *see also In re Application for an Order Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in Foreign Proceedings*, 773 F.3d 456, 461 (2d Cir. 2014) (holding that, even though "[t]he defendant … [had] already been charged …. the District Court did not err in finding that the [documents sought were] 'for use in a proceeding in a foreign or international tribunal' as required by § 1782.").

44. All three requirements are met here. <u>First</u>, Petitioner is an "interested party" in the Foreign Legal Proceedings because: (1) it is a party to the ongoing appeal and damages proceedings in Belgium; (2) it can submit evidence in the pending Luxembourg criminal proceedings; and (3) it is a party to the ongoing proceedings in the Netherlands and would be a party in anticipated proceedings to collect on the English Cost Orders. Kirtland Decl. ¶ 55.

45. <u>Second</u>, TCH can be found in this District because it maintains offices at 1114 Avenue of the Americas, 17th Floor, New York, New York 10036. *Id.* ¶ 56.

46. <u>Third</u>, the information sought by Petitioner is "for use" in the Foreign Legal Proceedings. *Id.* ¶ 57. Specifically, as described in detail herein, Petitioner will use the requested information to further support the contentions in those proceedings that the Statis have engaged in the above-referenced fraud and money laundering schemes. *Id.* Petitioner will also use the requested information to locate the Statis' assets to execute on the English Cost Orders and any judgment issued in the Belgium Damages Proceedings.

## V.     THE *INTEL* FACTORS WEIGH IN FAVOR OF GRANTING THE PETITION

47.     The Supreme Court has identified four discretionary factors that a district court must consider when ruling on a § 1782 application: (1) whether the person from whom discovery is sought is a participant in the foreign proceeding; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (3) whether the § 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether discovery would be unduly intrusive or burdensome.  *Intel,* 542 U.S. at 264–65.

48.     Here, all four *Intel* factors weigh in favor of granting the Petition. First, TCH is not a participant in the foreign proceedings.  Kirtland Decl. ¶ 59; *cf. Intel*, 542 U.S. at 264 ("[W]hen the person from whom discovery is sought is a participant in the foreign proceeding . . . , the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad.").

49.     Second, there is no indication, or reason to believe, that the courts in the Foreign Legal Proceedings would be unreceptive to judicial assistance by § 1782 discovery.  To the contrary, in many of the Foreign Legal Proceedings, including *inter alia* the Luxembourg criminal proceedings, evidence obtained via § 1782 discovery has been submitted and accepted.  Kirtland Decl. ¶ 60.

50.     Third, this request is not sought to, and does not have the effect of, circumventing any foreign proof-gathering restrictions or other policies.  *Id.* ¶ 61.

51.     Lastly, this request is not unduly burdensome or intrusive.  It seeks discrete, narrowly tailored categories of records in the possession, custody, and control of TCH.  *Id.* ¶ 62.

Furthermore, TCH will have available all of the protections afforded under Federal Rule of Civil Procedure 45.

## CONCLUSION

WHEREFORE, because the Petition complies with the requirements of 28 U.S.C. § 1782, and the *Intel* discretionary factors weigh in favor of it being granted, Petitioner respectfully moves the Court to issue the attached order granting the Petition, authorizing the issuance of the subpoena *duces tecum* in the form attached hereto as Exhibit A, and authorizing Petitioner to issue additional subpoenas for the production of documents of TCH as is reasonably necessary and consistent with the Federal Rules of Civil Procedure.

Dated: December 23, 2022

Respectfully submitted,

*/s/ Felice B. Galant*
Felice B. Galant
**NORTON ROSE FULBRIGHT US LLP**
1301 Avenue of the Americas
New York, NY 10019-6022
Tel.: (212) 318-3000
Fax: (212) 318-3400
felice.galant@nortonrosefulbright.com

OF COUNSEL:
Matthew Kirtland (*pro hac vice forthcoming*)
Esha Kamboj
**NORTON ROSE FULBRIGHT US LLP**
799 9th St. NW Suite 1000
Washington, DC 20001
Tel.: (202) 662-0200
Fax: (202) 662-4643
matthew.kirtland@nortonrosefulbright.com
esha.kamboj@nortonrosefulbright.com

*Attorneys for Petitioner Republic of Kazakhstan*